# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:  19-cv-00680 RBJ

DEREK J. WEBB,

      Plaintiff,

v.

ACES UP GAMING, INC.,
CHARLES RAWLS DRENNAN III,
TODD TAYLOR, and DOES 1-10,

      Defendants.

---

### PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Derek J. Webb ("Plaintiff"), for his Second Amended Complaint against

Defendants Aces Up Gaming, Inc., Charles Rawls Drennan III, and Todd Taylor (collectively,

"Defendants"), alleges as follows:

### JURISDICTION

1.     This Court has original jurisdiction over this action.  It is a civil action in which

there is diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

2.     Plaintiff Derek J. Webb is, and was, at all times mentioned herein, a British

citizen who is lawfully admitted for permanent residence in the United States and who is

domiciled in, and a resident of, the State of Nevada.  For purposes of diversity jurisdiction,

Plaintiff is a citizen of Nevada.

3.     Upon information and belief, Defendant Aces Up Gaming, Inc. ("Aces Up") is a

Colorado corporation with its principal place of business in Colorado; upon information and

belief, its principal place of business is located at 5855 West 38th Avenue, Wheat Ridge Colorado, 80212.

4.      Upon information and belief, Defendant Charles Rawls Drennan III ("Defendant Drennan") is, and was, at all times mentioned herein, domiciled in, and is a citizen of, the State of Colorado.

5.      Upon information and belief, Defendant Drennan is the President and sole owner of Aces Up.

6.      Upon information and belief, Todd Taylor ("Defendant Taylor") is, and was, at all times mentioned herein, domiciled in, and is a citizen of, the State of Colorado.

7.      On information and belief, Defendant Taylor is a former owner of Aces Up, and currently serves as an independent contractor to Aces Up.

8.      For purposes of diversity jurisdiction, all Defendants are citizens of Colorado.

9.      Non-party Tony Cranford ("Mr. Cranford") is an individual domiciled in the State of Nevada.

10.      Upon information and belief, Mr. Cranford's business interests are located in Nevada; Mr. Cranford maintains a residence in Nevada, pays taxes in Nevada, and has a Nevada driver's license.

11.      Upon information and belief, Mr. Cranford intends to remain in Nevada indefinitely.

12.      Mr. Cranford is a citizen of Nevada for purposes of diversity jurisdiction.

13.      This action is of a civil nature involving, exclusive of interest and costs, a sum in excess of $75,000.00.

14.      This Court has general personal jurisdiction over Defendants because they are either organized under Colorado's laws, or natural persons residing in Colorado.

109585612.1

15. This Court also has specific personal jurisdiction over Defendants because they purposefully availed themselves of the laws and protections of this forum by conducting business here, including, but not limited to, and by entering into a contract to be performed in Colorado that required Defendants to distribute funds from Colorado for the benefit of Plaintiff, as more fully described herein.

16. Under these circumstances, the exercise of jurisdiction over Defendants would be reasonable.

17. Plaintiff alleges that the entities named herein as Does 1 through 10 are individuals, corporations, limited liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to Plaintiff at this time. Plaintiff will seek leave to amend this Complaint to include the true names of Does 1 through 10 when the identities of such Defendants become known.

## VENUE

18. Venue is proper in the District of Colorado because the incident complained of, or a substantial part thereof, occurred in Colorado.

## FACTUAL ALLEGATIONS

### *This Lawsuit Arises from the Resolution of a Prior Lawsuit*

19. This case arises from the resolution of an underlying lawsuit styled *Shuffle Tech International LLC, et al. v. Scientific Games Corp., et al.*, Case No. 1:15-CV-03702 (N.D. Ill. 2015) (the "Shuffle Tech Lawsuit").

20. In the Shuffle Tech Lawsuit, Shuffle Tech International LLC ("Shuffle Tech"), Poydras-Talrick Holdings, LLC ("Poydras") (both non-parties to this lawsuit) and Aces Up (a

named Defendant herein) sued Scientific Games Corporation, d/b/a Bally Technologies, Inc., and others (the "Scientific Games Defendants"), asserting anti-trust claims.

21.     The plaintiffs in the Shuffle Tech Lawsuit alleged that the Scientific Games Defendants fraudulently obtained and used patents related to the gaming industry by means of a sham lawsuit asserted against a company that had licensed patents owned by Shuffle Tech and Poydras.

22.     The amount in controversy and the complexity of the Shuffle Tech Lawsuit were exceptional.  The Shuffle Tech Lawsuit plaintiffs sought, among other relief, a declaration that patents nominally owned by the Scientific Games Defendants were unenforceable because of fraud, and that the court awarded $100,000,000 in compensatory damages and an additional $100,000,000 in enhanced or treble damages pursuant to federal antitrust laws.

23.     The Scientific Games Defendants were large companies with significant resources.  The litigation promised to be protracted, and the Shuffle Tech Lawsuit plaintiffs lacked the financial resources necessary for prosecuting the Shuffle Tech Lawsuit.

24.     Prior to and during the pendency of the Shuffle Tech Lawsuit, Mr. Cranford was an independent contractor of Defendant Aces Up, a plaintiff in the Shuffle Tech Lawsuit. Mr. Cranford became aware of the need for the Shuffle Tech plaintiffs to procure additional financing in order to continue with the Shuffle Tech Lawsuit.

25.     Mr. Cranford and Plaintiff were longtime acquaintances before the filing of the Shuffle Tech Lawsuit.  Mr. Cranford was aware that Plaintiff had previous experience as a participant and as a plaintiff in similar lawsuits.

26.     Mr. Cranford introduced Plaintiff to the Shuffle Tech Lawsuit plaintiffs. Mr. Cranford also put the Shuffle Tech Lawsuit plaintiffs into contact with attorneys with experience in similar hybrid intellectual property and antitrust claims.

4

27.     To proceed with the Shuffle Tech Lawsuit, the Shuffle Tech Lawsuit plaintiffs, Plaintiff, and others, including attorneys representing the Shuffle Tech plaintiffs (Nixon & Vanderhye, P.C. ("N&V")) entered into a Litigation Financing Agreement on or about March 15, 2015 (the "Financing Agreement").

28.     The parties to the Financing Agreement ("Parties") agreed that each would provide certain assistance, including financial or other assistance, to ensure the success of the Shuffle Tech Lawsuit.  In return, the parties agreed to share in any recovery resulting from the lawsuit based on the predetermined allocation percentage specified in the agreement.

***The Parties Agreed in Advance in Writing How to Divide Any Shuffle Tech Lawsuit Recovery***

29.     Pursuant to the Financing Agreement, the plaintiffs were entitled to receive a specified percentage of the recovery after the parties accounted for the reimbursement of certain costs and attorneys' fees advances and other recovery or other pre-arranged debits. Aces Up was then entitled to receive a specified percentage of the recovery that was allocated to the plaintiffs.

30.     The plaintiffs' percentage of any award under the Financing Agreement was reduced over time, as the case progressed through various stages of litigation. This effectively reduced Aces Up's total monetary recovery as the case progressed.

31.     For example, plaintiffs were entitled to receive 52.5% of the award if it was resolved during "Phase 2" of the litigation (Fact Discovery), but were only entitled to receive 28.5% of the award if the litigation resolved during or after "Phase 6" or the trial/post-trial phase of the litigation. Aces Up was entitled to receive 12.88% of the plaintiffs' award regardless of when the litigation was resolved.

32.     Under the Financing Agreement, any distribution allocated to Defendant Aces Up was to be allocated on a percent basis between three individuals: Mr. Cranford, Defendant Taylor, and Defendant Drennan. Specifically, Mr. Cranford was entitled to receive 56% of Aces

Up's total recovery, and Mr. Taylor and Mr. Drennan were each to receive 22% of Aces Up's total recovery.

33. The amount of any monetary recovery received by Mr. Cranford, Defendant Taylor, and Defendant Drennan was thus directly tied to the monetary award that was allocated to Defendant Aces Up. As the plaintiffs' percentage of the overall recovery decreased, Aces Up's total monetary allocation decreased; as Aces Up's allocation decreased, Mr. Cranford's total monetary allocation also decreased.

34. Aces Up actively participated in the negotiation of the Financing Agreement, including the negotiation of the "Aces Up" allocation percentage and the allocation of Aces Up's award to Mr. Cranford, Mr. Drennan, and Mr. Taylor.

35. The Financing Agreement specifically prohibited modification of the agreement, including modification of the allocation of potential settlement proceeds, except by a writing signed by or on behalf of all Parties.

36. The Financing Agreement also contains a merger/integration clause stating that the Financing Agreement constitutes the "entire agreement" between and the Parties with respect to the allocation of the proceeds of the Shuffle Tech Lawsuit.

37. Defendants knew and were aware of the terms of the Financing Agreement and specifically agreed that Tony Cranford was entitled to receive 56% of Aces Up's ultimate recovery from the Shuffle Tech Litigation.

***A Dispute Developed Between Mr. Cranford and Defendants***

38. When the Financing Agreement was executed, Mr. Cranford was an independent contractor who offered sales and marketing services to Defendant Aces Up.

39. Under Mr. Cranford's contract with Defendant Aces Up, Mr. Cranford marketed Defendant Aces Up's products in exchange for sales commissions.

109585612.1

40. Mr. Cranford also provided assistance to the Shuffle Tech plaintiffs during the litigation by helping to prepare evidence, giving a deposition, working on the calculation of damages, and doing other tasks.

41. During the pendency of the Shuffle Tech Lawsuit, a dispute arose between Mr. Cranford, Aces Up, and Defendants Drennan and Taylor.

42. Specifically, Defendants became dissatisfied with the percentage of any potential award they were entitled to receive under the Financing Agreement when, during the course of the lawsuit, it became clear that Aces Up's monetary damages would exceed amounts originally projected/estimated.

43. Defendants decided to work together and conspired to increase their share of the proceeds of the Shuffle Tech Lawsuit.

44. First, Defendants attempted to force Mr. Cranford to agree to reduce the percentage of Aces Up's monetary recovery that Mr. Cranford was owed under the Financing Agreement.

45. When Mr. Cranford refused, over time and without cause, Defendant Aces Up reduced the commissions Mr. Cranford was receiving pursuant to his agreement with Aces Up from about $14,000 per month to approximately $3,000 per month. Eventually, Mr. Cranford stopped receiving commissions altogether.

46. By reducing Mr. Cranford's commissions, Defendants acted in concert to financially pressure Mr. Cranford into agreeing to reduce his percentage of the Shuffle Tech Lawsuit recovery under the Financing Agreement.

47. Mr. Cranford refused to consent to any reduction in his percentage of Aces Up's ultimate award under the Financing Agreement.

48. When their efforts were unsuccessful, Defendants constructively terminated Mr. Cranford's independent contractor relationship with Defendant Aces Up.

49.     Defendants also worked together and conspired to draft an "Amendment to the Litigation Financing Agreement" which purported to cap Mr. Cranford's maximum recovery from the Shuffle Tech Litigation at approximately $12.8 million.

50.     The proposed amendment (which was drafted on Aces Up letterhead) states that Mr. Cranford "is entitled to 56% of the final amount awarded to Aces Up based upon the agreement dated March 15, 2015."

51.     Defendants texted Mr. Cranford this agreement, stating, "U will be entitled to your original agrees [sic] upon amount."

52.     Consistent with the terms of the Financing Agreement, the proposed amendment acknowledges Mr. Cranford's unqualified and unequivocal right to receive 56% of the "final amount" awarded to Aces Up.

53.     Mr. Cranford refused to consent to a cap on the total amount he could be entitled to receive under the Financing Agreement.

54.     Immediately after Mr. Cranford rejected Defendants' offer, Defendants began to formulate a plan to deprive Mr. Cranford of his rightful distribution of settlement proceeds under the Financing Agreement.

55.     After their offer was rejected, Defendant Drennan immediately reached out to N&V attorneys to discuss the distribution of any potential proceeds from the Shuffle Tech Litigation.

56.     Under the LFA, the parties understood that Aces Up's allocation was not to be retained by, or even initially paid to, Defendant Aces Up the corporation; rather any distribution was to be made, in the first instance, directly to the named individuals affiliated with Defendant Aces Up, including Mr. Cranford.

57.     N&V understood that under the Financing Agreement, Mr. Cranford was to receive his portion of the award, paid to him directly from N&V.

8

58.     When it became clear that Mr. Cranford would not agree to reduce or cap his settlement distribution under the Financing Agreement, Defendants contacted N&V and informed them that Aces Up's portion of the settlement award was not to be distributed to the individuals named in the Financing Agreement (including Mr. Cranford), but that it was to be distributed directly to Aces Up.

59.     Defendants falsely represented to N&V that they wanted Aces Up's allocation to flow through Aces Up for tax purposes, and not so that they could deprive Mr. Cranford of his share of the settlement proceeds under the Financing Agreement. In reality, however, Defendants came up with this story in order to gain possession of Mr. Cranford's distribution so they could convert and steal 30% of it for their benefit.

60.     The Financing Agreement provides that the Shuffle Tech plaintiffs' settlement allocation could not be distributed to the Shuffle Tech plaintiffs unless and until all Shuffle Tech plaintiffs (including Aces Up) agreed on and provided N&V with unanimous instructions as to their distributions.

61.     Defendants refused to consent to the distribution of the settlement proceeds unless the plaintiffs agreed that Aces Up would receive the entire amount of its allocated proceeds directly.

62.      Defendants intentionally coerced and caused the plaintiffs to direct N&V to deposit the entirety of Aces Up's allocated settlement with Aces Up.

63.     In refusing to consent to the distribution of the settlement proceeds to the individuals named in the Financing Agreement, including Tony Cranford, Defendants ensured that the proceeds would be paid directly to Aces Up, so that Aces Up could control and ultimately refuse to provide Mr. Cranford with the funds he was entitled to under the Financing Agreement.

109585612.1

64.     Defendants intentionally and maliciously caused Aces Up's portion of the settlement proceeds to be deposited with Aces Up specifically so that they could deny Mr. Cranford receipt of his rightful 56% of Aces Up's settlement distribution.

65.     Defendants did so even though they were advised by N&V attorneys that Mr. Cranford was entitled to 56% of Aces Up's recovery, and that failing to distribute that amount to him would be in violation of the Financing Agreement.

66.     Defendants intended to permanently and forever deprive Mr. Cranford of a portion of his rightful proceeds from the Shuffle Tech settlement.

67.     Defendants' plan was orchestrated specifically to increase the total amount of the Shuffle Tech settlement received by the Defendants.

***Defendants Engage in Self-Dealing and Bad Faith During the Shuffle Tech Litigation***

68.     On information and belief, Defendants Drennan, Taylor, and Aces Up worked to undermine the Shuffle Tech plaintiffs during the pendency of the lawsuit.

69.     On information and belief, while the Shuffle Tech Lawsuit was pending, Defendants Drennan and Taylor had contact with the Scientific Games Defendants for the purpose of negotiating an independent agreement between Aces Up and Scientific Games.

70.     Upon information and belief, Defendants attempted to negotiate a unilateral settlement between Aces Up and the Scientific Games Defendants.

71.     Upon information and belief, Defendants also offered to sell Aces Up to the Scientific Games Defendants.  The sale would have allowed the Scientific Games Defendants to influence the litigation through Aces Up, and/or would have given the Scientific Games Defendants certain rights under the Financing Agreement through Aces Up.

72.     Upon information and belief, Defendants executed a Non-Disclosure Agreement with Scientific Games Defendants in part to conceal their actions from the other plaintiffs.

109585612.1

73.     The other Parties to the Financing Agreement were not aware of Defendants'
actions at the time and did not consent to Aces Up's independent negotiations.

74.     Upon information and belief, Defendants' negotiations with the Scientific Games
Defendants were intended to maximize Defendants' financial gain from the Shuffle Tech
Lawsuit at the expense of the other Parties to the Financing Agreement.

***The Shuffle Tech Lawsuit Resulted in a Remarkable Verdict***

75.     The tension created by Defendants' treatment of Mr. Cranford was apparent up to
and including the trial of the Shuffle Tech Lawsuit.  Plaintiff discouraged Mr. Cranford from
attending trial in order to prevent the dispute from becoming known to the Scientific Games
Defendants.

76.     At trial, the Shuffle Tech Lawsuit plaintiffs prevailed in a spectacular fashion.  On
August 7, 2018, a jury rendered a verdict in favor of the Shuffle Tech Lawsuit plaintiffs and
against the Scientific Games Defendants in the combined amount of $315 million.

77.     Following trial, the Parties, with the exception of Aces Up, wanted to obtain
additional litigation funding so the Parties could defend their judgment through the appellate
process.

78.     Had the Parties obtained such financing, it is unlikely that the dispute would have
resulted in settlement.

79.     Due in part to Aces Up's reluctance to seek additional financing, the Parties to the
Shuffle Tech Lawsuit entered into settlement negotiations.

80.     During the negotiations, it became apparent to the Shuffle Tech plaintiffs and
other Parties to the Financing Agreement that Defendants' attempt to renegotiate Mr. Cranford's
allocation percentage in bad faith was negatively impacting the settlement negotiations.

81.     The Parties, including Plaintiff, became concerned that the rift between
Defendants and Mr. Cranford would become known by the Scientific Games Defendants.

11

Plaintiff and others became concerned that this knowledge could embolden the Scientific Games Defendants and result in a lower settlement.

82. Moreover, Plaintiff and others were aware that the Defendants' actions with respect to Mr. Cranford could negatively impact the damages model the Shuffle Tech plaintiffs used at trial to support their sizable jury verdict.

83. Defendants' treatment of Mr. Cranford thus threatened the viability of the settlement, as well as the Parties' settlement position and ability to maximize the settlement value of the case.

84. Plaintiff and the other Parties were forced to push forward with settlement negotiations with the knowledge that Defendants' position with respect to Mr. Cranford could undermine their negotiations.

85. This knowledge caused the Parties to agree to accept less to settle the Shuffle Tech Lawsuit than they would have absent the ongoing dispute.

86. In December 2018, the parties to the Shuffle Tech Lawsuit entered into a settlement agreement for the total amount of $151,500,000.

87. After deducting costs and accounting for the other pre-determined debits, Aces Up was entitled to receive a total distribution of $3,898,004.55, to be allocated under the agreement. Under the agreement, Mr. Cranford was to receive 56% of that allocation, or at least $2,182,882.50.

88. Prior to the distribution of the settlement proceeds from the Shuffle Tech Lawsuit, Mr. Drennan and Mr. Taylor informed Mr. Cranford that they did not intend to honor the allocation percentages contained in the Financing Agreement and would not distribute 56% of Aces Up's settlement proceeds to Mr. Cranford.

109585612.1

89.     Defendants also continued to insist that Aces Up's Distribution flow through Aces Up, and not be paid directly to the individuals named in the Financing Agreement, including Mr. Cranford.

90.     On or about December 21, 2018, the counsel of record for the Shuffle Tech Lawsuit plaintiffs, which held the settlement funds in trust, distributed the settlement proceeds to the Parties to the Financing Agreement, including Plaintiff and Defendant Aces Up.

91.     A distribution in the amount of $3,898,004.55 was to be made to Defendant Aces Up, and not to the three individuals indicated in the Financing Agreement.

92.     Mr. Cranford did not receive any amounts due to him under the Financing Agreement on December 21, 2018.

**Mr. Cranford Assigned His Rights in the Aces Up Recovery to Plaintiff**

93.     In December 2018, Mr. Cranford believed that Aces Up intended, in bad faith, to withhold payment of any and all of his allocable percentage of the settlement proceeds under the Financing Agreement.

94.     Mr. Cranford was not aware that Aces Up intended to distribute some, but not all, of the funds owed to him under the Financing Agreement.

95.     In December 2018, Mr. Cranford was in financial distress which the Defendants hoped to exploit by forcing Mr. Cranford into accepting less than the amount to which he was contractually entitled.  When Mr. Cranford learned that Aces Up did not intend to honor the terms of the Financing Agreement, he began to explore other options to access the benefits he was entitled to under the Financing Agreement.

96.     Plaintiff was aware that Defendants Aces Up, Drennan, and Taylor did not intend to distribute the funds owed to Mr. Cranford under the Financing Agreement to Mr. Cranford in accordance with the terms of that agreement.

109585612.1

97.     Plaintiff acknowledged Mr. Cranford's role in bringing the Parties to the Financing Agreement together and enabling all involved to benefit from the success of the Shuffle Tech Lawsuit.

98.     Plaintiff was concerned that the person responsible for the arrangement was being treated unfairly by Defendants Aces Up, Drennan, and Taylor.

99.     Plaintiff is a sophisticated investor who had experience as a plaintiff in similar lawsuits and had previously benefited from litigation financing prior to his association with the Shuffle Tech Lawsuit.

100.    Plaintiff intends to seek investment opportunities in the future to participate in litigation financing.

101.    Plaintiff believed that Defendants' treatment of Mr. Cranford and the dispute regarding Mr. Cranford's percent allocation under the Financing Agreement could negatively impact his ability to participate in litigation financing agreements in the future.

102.    For example, Plaintiff was concerned that his involvement in a financing agreement which resulted in a participant receiving less than was agreed could discourage others from entering into similar agreements with Plaintiff in the future.

103.    For these reasons, Plaintiff offered to pay Mr. Cranford the amount due to him under the Financing Agreement in exchange for an assignment of Mr. Cranford's rights to receive payment under that agreement.

104.    Mr. Cranford agreed to Plaintiff's proposal in order to survive the financial strain inflicted upon him by the Defendants, and he assigned his interest in the Aces Up distribution under the Financing Agreement (the "Cranford Lawsuit Distribution") to Plaintiff.

105.    The assignment was memorialized in a Collateral Assignment of Payment ("Assignment"), under which Mr. Cranford assigned all rights, title, and interest in the Cranford Lawsuit Distribution to Plaintiff.

106.    The Assignment was further affirmed by the execution of a Secured Promissory Note dated December 21, 2018 ("Promissory Note"), under which Mr. Cranford agreed to repay the sums advanced to him by Plaintiff pursuant to the Assignment. Payment under the promissory note is specifically triggered by Mr. Cranford's receipt of the full amount owed to him under the Financing Agreement. The Promissory Note is secured by the Assignment of Mr. Cranford's interest in the Cranford Lawsuit Distribution.

107.    Following the execution of the Promissory Note, the funds were disbursed to Mr. Cranford by Plaintiff.

108.    Plaintiff advised Defendant Aces Up and its principals of the Assignment and of his unqualified right to receive the Cranford Lawsuit Distribution no later than December 21, 2018.

109.    The Defendants acknowledge Plaintiff's right to receive the Cranford Lawsuit Distribution and have made a partial payment made directly to Plaintiff.

110.    Indeed, the Defendants have released some, but not all, of the Cranford Lawsuit Distribution.

111.    On about December 31, 2018, the Defendants released $1,013,481.18 to Plaintiff—or less than half of the Cranford Lawsuit Distribution to which Plaintiff is entitled.

112.    Plaintiff made several demands upon the Defendants for the balance of the Cranford Lawsuit Distribution.

113.    In response, the Defendants, and particularly Defendant Drennan, claimed that the Financing Agreement was orally modified to reduce the percentage of the Aces Up distribution Mr. Cranford was entitled to receive.

114.    There is no written evidence of this alleged modification.

115.    Upon information and belief, Defendants invented the alleged oral modification in order to justify withholding amounts due to Mr. Cranford under the Financing Agreement. In

15

fact, between December 2016 and December 2017 Defendants attempted to coerce Mr. Cranford into voluntarily reducing his distribution, repeatedly affirming his contractual right to 56%.

116.   Mr. Cranford denies that he ever entered into an oral agreement regarding his distribution under the LFA or otherwise agreed to modify it at any point in time..

117.   Despite demand, Defendants refused to pay Plaintiff the balance of the Cranford Lawsuit Distribution, or $1,169,401.4.

118.   On March 27, 2019, the Parties received an additional "adjusted" allocation of the Shuffle Tech Lawsuit Settlement proceeds.

119.   Aces Up received in additional $6,709.24 pursuant to the adjustment.

120.   Mr. Cranford, and Plaintiff through the Assignment, is owed an additional 56% of the March 2019 Aces Up distribution, or $3,757.17.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract—Defendant Aces Up)

121.   Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

122.   The Shuffle Tech Lawsuit plaintiffs, Defendant Aces Up, counsel of record in the Shuffle Tech Lawsuit, and Plaintiff (in both his individual capacity and as assignee of the Cranford Lawsuit Distribution under the Assignment) are Parties to the Financing Agreement, which is a valid and enforceable contract.

123.   The Parties who formed the Financing Agreement intended to convey a benefit to Mr. Cranford and intended the benefit to be enforceable by Mr. Cranford, as a third-party beneficiary.  Plaintiff is also a third-party beneficiary by virtue of the Assignment.

124.   Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution) performed all of his obligations under the Financing Agreement or was excused from performance of said obligations.

125.     Defendant Aces Up has breached its obligations to Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution) by, among other things, failing, refusing, and neglecting to make the balance of the Cranford Lawsuit Distribution payment due to Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution), an amount no less than $1,173,158.50.

126.     As a direct and proximate result of Defendant Aces Up's breaches, Plaintiff has suffered damages in an amount to be proven at trial.

127.     Plaintiff has also sustained special damages as a result of Defendant Aces Up's breaches in the form of incurring attorneys' fees to file a lawsuit to compel a complete disbursement of the Cranford Lawsuit Distribution.  These attorneys' fees constitute an element of damages foreseeable from Defendant Aces Up's breach of the Financing Agreement and are so pleaded pursuant to Rule 9(g).  *See, e.g., Bunnett v. Smallwood*, 793 P.2d 157, 160 (Col. 1990) (Attorneys' fees are clearly damages if they are part of the substance of a lawsuit, that is, if the fees being sought are "the legitimate consequences of the tort or breach of contract sued upon.").

## SECOND CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing—Defendant Aces Up)

128.     Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

129.     Every contract, including the Financing Agreement at issue herein, contains an implied covenant of good faith and fair dealing.

130.     Defendant Aces Up owes, and owed, a duty of good faith and fair dealing under the Financing Agreement.  This duty was owed to Plaintiff as a party to the Financing Agreement and to Mr. Cranford as a non-party beneficiary to the agreement.

109585612.1

131.     Defendant Aces Up breached its duty of good faith and fair dealing through acts and omissions that were unfaithful to the purposes and spirit of the Financing Agreement. Among other circumstances, Defendant Aces Up breached the implied covenant by:

a.      Entering into unilateral negotiations with the Scientific Games Defendants without informing the other Parties to the Financing Agreement in an attempt to profit from the Shuffle Tech Lawsuit at the expense of the other Parties;

b.      Undermining the settlement position of the Parties through its ex parte contacts with the Scientific Games Defendants, which indicated to the Scientific Games Defendants that the Parties were not united in their willingness to continue to prosecute the Shuffle Tech Lawsuit;

c.      Refusing to acknowledge Mr. Cranford's right to the percentage of any potential settlement specified in the Financing Agreement and instigating an ongoing dispute between the Parties to the Financing Agreement, which impacted the Parties' settlement negotiations and resulted in a lower final settlement in the Shuffle Tech Lawsuit;

d.      Insisting, contrary to the reasonable expectations of the Parties to the Financing Agreement, that the Shuffle Tech Lawsuit settlement funds earmarked for the three persons affiliated with Defendant Aces Up (Mr. Cranford and Defendants Drennan and Taylor) be diverted from those persons and directed to Defendant Aces Up at a corporate level;

e.      Failing, refusing, and neglecting to distribute the Cranford Settlement Distribution to Mr. Cranford and/or Plaintiff without cause;

f.      Failing, refusing, and neglecting to communicate with Mr. Cranford and/or Plaintiff to resolve the dispute concerning the Cranford Lawsuit Distribution;

18

g.　　Failing, refusing, and neglecting to provide any rationale or calculation supporting its withholding of no less than $1,173,158.50 of the Cranford Lawsuit Distribution; and

h.　　Generally engaging in the conduct described in this Complaint.

132.　　As a direct and proximate result of Defendant Aces Up's breach of the implied covenants described herein, Plaintiff has suffered damages in an amount to be determined at trial.

133.　　As a further, direct result of Defendant Aces Up's breach of the implied covenant of good faith and fair dealing, Plaintiff has incurred and continues to incur attorneys' fees and costs in the enforcement of his rights and remedies. Defendant Aces Up is liable to Plaintiff for such expenses in an amount to be proven at trial.

134.　　Plaintiff has also sustained special damages as a result of Defendant Aces Up's breaches in the form of incurring attorneys' fees to file a lawsuit to compel a complete disbursement of the Cranford Lawsuit Distribution. These attorneys' fees constitute an element of damages foreseeable from Defendant Aces Up's breach of the Financing Agreement and are so pleaded pursuant to Rule 9(g). *See, e.g., Bunnett v. Smallwood*, 793 P.2d 157, 160 (Col. 1990) (Attorneys' fees are clearly damages if they are part of the substance of a lawsuit, that is, if the fees being sought are "the legitimate consequences of the tort or breach of contract sued upon.").

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty—Defendants Drennan and Taylor)

135.　　Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

136.　　Defendants Drennan and Taylor are non-party beneficiaries to the Financing Agreement.

137.     Defendant Drennan, Defendant Taylor, and Mr. Cranford understood that each would receive their proportional percentages of the Aces Up distribution in accordance with the terms of that agreement.

138.     Mr. Cranford placed a high level of trust in Defendants Drennan and Taylor to ensure that the proceeds of the Aces Up distribution were distributed to Mr. Taylor in the amount specified in the Financing Agreement.

139.     This relationship continued when the entirety of the Aces Up distribution was placed in the trust of Aces Up to be distributed to Defendant Drennan, Defendant Taylor, and Mr. Cranford.

140.     A fiduciary relationship exists between Defendants Drennan and Taylor and Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution) because Defendants Drennan and Taylor, by virtue of their control over Defendant Aces Up, were placed in a position of trust and confidence by Mr. Cranford as to their control over the Cranford Settlement Distribution.

141.     Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution) must and did rely on Defendants Drennan and Taylor to ensure that the Cranford Settlement Distribution was turned over to Mr. Cranford (and Plaintiff, once the Assignment was made known) in accordance with the provisions of the Financing Agreement.

142.     By virtue of their control over Defendant Aces Up, Defendants Drennan and Taylor were empowered to and in fact did orchestrate the receipt of the Aces Up distribution directly by Defendant Aces Up, instead of directing the distribution to the three named beneficiaries designated in the Financing Agreement.

143.     Defendants Drennan and Taylor have repeatedly breached their fiduciary obligations by failing, refusing, and neglecting to make the balance of the Cranford Lawsuit

Distribution payment due to Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution), an amount no less than $1,173,158.50.

144.     Upon information and belief, Defendants Drennan and Taylor have further breached their fiduciary duties by diverting the balance of the Cranford Lawsuit Distribution payment to themselves for their own personal use.

145.     As a direct and proximate result of Defendant Drennan and Defendant Taylor's conduct, Plaintiff has suffered and will continue to suffer damages, including economic and compensatory, in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment—All Defendants)

146.     Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

147.     As an alternative to the causes of action arising under the express, written contract, namely the Financing Agreement, Plaintiff alleges unjust enrichment against all Defendants.

148.     Defendants have diverted, accepted, and sequestered the balance of the Cranford Lawsuit Distribution payment due to Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution), an amount no less than $1,173,158.50.

149.     Defendants received this benefit to the detriment of Plaintiff.

150.     Upon information and belief, Defendants Drennan and Taylor have caused Defendant Aces Up to disburse the balance of the Cranford Lawsuit Distribution to themselves and are keeping, using, and enjoying the money in their individual capacities.

151.     Under the circumstances described above, Defendants have been unjustly enriched in the amount of no less than $1,173,158.50 that belongs to Plaintiff, against fundamental principles of justice, equity, and conscience.

109585612.1

152.     It would be unjust for the Defendants to retain this amount without compensating Mr. Cranford and/or Plaintiff.

## FIFTH CLAIM FOR RELIEF

### (Conversion – All Defendants)

153.     Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

154.     Under the Financing Agreement, Mr. Cranford and/or Plaintiff was entitled to and expected to receive a distribution of 56% of Aces Up's award directly to Mr. Cranford and/or Plaintiff.

155.     N&V understood that Mr. Cranford was to receive his portion of the award, paid to him directly from N&V.

156.     Defendants refused to consent to the distribution of the settlement proceeds unless the Shuffle Tech plaintiffs agreed that Aces Up would receive the entire amount of its allocated proceeds directly.

157.      Defendants caused the Shuffle Tech plaintiffs to direct N&V to cause the entirety of Aces Up's allocated settlement to be deposited with Aces Up.

158.      Defendants exercised dominion and control over Plaintiff's property, including by failing, refusing, and neglecting to make the balance of the Cranford Lawsuit Distribution payment due to Mr. Cranford (and Plaintiff by virtue of the Assignment concerning the Cranford Lawsuit Distribution), an amount no less than $1,173,158.50, and thereafter usurping, converting, and absconding with these funds.

159.      Upon information and belief, Defendants Drennan and Taylor have caused Defendant Aces Up to disburse the balance of the Cranford Lawsuit Distribution to themselves and are keeping, using, and enjoying the money in their individual capacities.

109585612.1

160.     Defendants' receipt of and subsequent retention of the Cranford Lawsuit Distribution payment was not authorized by Mr. Cranford or Plaintiff.

161.     Plaintiff has previously demanded that Defendants turn over the balance of the Cranford Lawsuit Distribution payment to Plaintiff.

162.     As a direct and proximate result of the Defendants' unauthorized exercise of dominion and control over such Plaintiff's property, Plaintiff has suffered, and will continue to suffer, irreparable injury and monetary loss.

## SIXTH CLAIM FOR RELIEF

### (Civil Theft (C.R.S. §§ 18-4-401(1) and 405) – Defendants Drennan and Taylor)

163.     Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

164.     Under the Financing Agreement, Mr. Cranford and/or Plaintiff was entitled to and expected to receive a distribution of 56% of Aces Up's award directly to Mr. Cranford and/or Plaintiff.

165.     Defendants intentionally and maliciously insisted that Aces Up's portion of the award be distributed solely to Aces Up instead of the individuals named in the Financing Agreement, including Mr. Cranford.

166.     Through their efforts to direct the proceeds of the Shuffle Tech Litigation to Aces Up, Defendants knowingly obtained control over Mr. Cranford's portion of the Shuffle Tech settlement proceeds without authorization by the rightful owner, Mr. Cranford.

167.     Defendants have continued to retain, and/or exercise control over the remainder of Mr. Cranford's portion of the Shuffle Tech settlement proceeds knowing that Mr. Cranford is entitled to those proceeds under the Financing Agreement.

168.     Defendants have acted to intentionally deprive Mr. Cranford (and Mr. Webb, through assignment) of the property permanently by refusing to deliver Mr. Cranford the funds owed.

169.     Mr. Cranford (and Plaintiff) have previously demanded that Defendants turn over the balance of the Cranford Lawsuit Distribution payment to Plaintiff.

170.     Upon information and belief, Defendants Drennan and Taylor have caused Defendant Aces Up to disburse the balance of the Cranford Lawsuit Distribution to themselves and are keeping, using, and enjoying the money in their individual capacities.

171.     As a direct and proximate result of the Defendants' unauthorized exercise of dominion and control over such Plaintiff's property, Plaintiff has suffered, and will continue to suffer, irreparable injury and monetary loss.

172.     Pursuant to C.R.S. § 18-4-405, Plaintiff is entitled to his reasonable attorneys' fees, costs, and treble damages from the Defendants.

## SEVENTH CLAIM FOR RELIEF

### (Conspiracy – All Defendants)

173.     Plaintiff repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

174.     Defendants entered into the Financing Agreement, under which Mr. Cranford was clearly entitled to receive 56% of any recovery allocated to Aces Up.

175.     Defendants agreed, by words or conduct, to financially pressure Mr. Cranford into modifying that contractual agreement to reduce or cap his allocation percentage under the Financing Agreement.

176.     When Mr. Cranford refused to consent to this modification Defendants agreed, by words or conduct, to obtain control over Mr. Cranford's portion of the proceeds from the Shuffle Tech Lawsuit.

177.     Defendants agreed to claim the existence of an oral agreement that preceded the Financing Agreement, despite no such agreement having ever been made.

178.     Defendants agreed, by words or conduct, to ensure that payment of Aces Up's allocation under the Financing Agreement was paid to Aces Up, and not to the individuals named in the Financing Agreement.

179.     Defendants acted on this agreement by insisting that N&V make payment directly to Aces Up, and by withholding their consent to the distribution of the Shuffle Tech plaintiffs settlement allocation until the other plaintiffs and N&V agreed to these terms.

180.     Defendants have performed numerous unlawful acts, including civil theft, breach of fiduciary duty, and conversion, and have performed these acts in order to abscond with Mr. Cranford's portion of the Shuffle Tech settlement proceeds.

181.     As a direct and proximate result of this misconduct, Plaintiffs have been damaged in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### (Exemplary Damages, C.R.S. § 13-21-102 – All Defendants)

182.     Plaintiffs hereby incorporate by reference all allegations set forth above as if fully set forth herein.

183.     The parties have exchanged initial disclosures and initial discovery.

184. Through discovery, Plaintiffs uncovered evidence that Defendants' wrongful conduct was attended by circumstances of fraud, malice, and/or willful and wanton conduct, including but not limited to the evidence set forth above that Defendants conspired to intentionally and permanently deprive Mr. Cranford (and Mr. Webb) of Mr. Cranford's rightful settlement allocation by:

a. engaging in willful and wanton, malicious conduct to financially pressure Mr. Cranford to reduce or cap his allocation percentage under the Financing Agreement;

b. when these efforts failed, fraudulently alleging the existence of an alleged oral agreement that purports to substantively modify the terms of the Financing Agreement;

c. willfully and wantonly acting to ensure that Mr. Cranford's settlement proceeds were not paid directly to him by N&V but were instead paid to (and thus controlled by) Aces Up; and

d. willfully and wantonly refusing to distribute to Mr. Cranford (or Mr. Webb) the full amount of his settlement allocation, requiring him to initiate litigation to recover what was due to him under the Financing Agreement.

185. Plaintiff has suffered harm as a result of Defendants' wrongful conduct.

WHEREFORE, Plaintiff demands judgment against Defendants for:

1. Compensatory damages in an amount to be proven at trial;

2. Punitive damages in an amount to be proven at trial;

3. Treble damages and attorneys' fees pursuant to C.R.S. §§ 18-4-401;

4. Interest at the rate allowed by applicable law;

5. Costs of suit incurred in this action;

6. Such other and further relief as this Court may deem just and proper.

109585612.1

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted:  December 9, 2019.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*/s/ Darren J. Lemieux*
Darren J. Lemieux
Abby C. Harder
1200 Seventeenth Street, Suite 3000
Denver, CO 80202-5835
Tel.:      303.623.9000
Fax:      303.623.9222
Email:   dlemieux@lrrc.com
            aharder@lrrc.com

*Attorneys for Plaintiff Derek J. Webb*

109585612.1

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

I hereby certify that on December 9, 2019, I electronically filed the forgoing

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND** with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:


Robert J. Zavaglia, Jr.
J. Brooks Fortune
TREECE ALFREY MUSAT P.C.
633 17th Street, Suite 2200
Denver, CO 80202
(303) 292-2700
FAX: (303) 295-0414
Email: zavaglia@tamlegal.com;
      bfortune@tamlegal.com
*Attorneys for Aces Up Gaming, Inc., Charles*
*Rawls Drennan, III, and Todd Taylor*


                              */s/ Darren J. Lemieux*
                              OF: Lewis Roca Rothgerber Christie LLP

109585612.1